IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 18, 2021 Session

## STATE OF TENNESSEE v. NOEL MALTESE

**Appeal from the Circuit Court for Williamson County
No. J-CR190426-B Robert E. Lee Davies, Senior Judge**

_____

**No. M2020-00518-CCA-R3-CD**

_____

The Appellant, Noel Maltese, was convicted in the Williamson County Circuit Court of conspiracy to commit theft of property valued $250,000 or more, a Class B felony, and criminal simulation, a Class E felony, and received an effective eight-year sentence to be served as forty-eight hours in jail followed by supervised probation. On appeal, the Appellant contends that the evidence is insufficient to support the convictions and that the trial court erred by allowing the State to cross-examine her about a codefendant's having to serve a lengthy prison sentence for similar conduct for which the Appellant was on trial. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Matthew J. Crigger (on appeal), Brentwood, Tennessee, and Eric Larsen (at trial), Franklin, Tennessee, for the appellant, Noel Maltese.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Kim Helper, District Attorney General; and Carlin Hess, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

This case relates to a home on McCanless Road in Nolensville that Brad Qualls and his wife purchased from the Appellant and her then-husband, Richard Maltese, in June 2016. The Williamson County Grand Jury indicted the Appellant; her brother, Leighton

Ward; and her mother, Penny Gilly, for attempted theft of property valued $250,000 or more in count one, conspiracy to commit theft of property valued $250,000 or more in count two, and hindering secured creditors in count five. The grand jury also indicted Ward for criminal simulation in count three and indicted the Appellant and Gilly for criminal simulation in count four. The State dismissed the charge of attempted theft in count one, and the Appellant proceeded to trial on counts two, four, and five. She was tried separately from her codefendants.

At trial, Mr. Qualls testified that he was married and had two daughters, ages six and three. In February 2016, the family was living in Nashville, but Mr. Qualls was looking for a new home for his family. His realtor found the home on McCanless Road, and Mr. Qualls and his wife visited the property. The home was vacant at that time. In March 2016, Mr. Qualls visited the home after a "hard rain" to see if the property "held water." The Appellant and her realtor were there, and the Appellant wanted to show Mr. Qualls around the property. Mr. Qualls described the Appellant as "very nice, very polite."

Mr. Qualls testified that in April 2016, his family moved into the McCanless Road home under a rental agreement while he tried to sell his own home in Nashville. The Appellant still owned the McCanless Road home, and Mr. Qualls did not have any issues with her during the rental period. In June 2016, Mr. and Mrs. Qualls purchased the home from the Appellant and her husband. The parties' realtors and a title company handled the closing on the property, and there were no issues during the closing process. Mr. and Mrs. Qualls paid $285,500 for the home and financed the purchase through Farmington Mortgage. The State showed Mr. Qualls a document, and he identified it as a copy of a warranty deed recorded in the Williamson County Register of Deeds Office on July 12, 2016. Mr. Qualls and his wife were named on the deed as the new owners of the property, and the Appellant and her husband were named as the sellers.

Mr. Qualls testified that on January 11, 2017, a man knocked on his front door and identified himself as Leighton Ward with the organization Advocacy for Consumer Rights. Mr. Qualls had never seen Ward before that day and had never heard of the organization. Ward told Mr. Qualls that "the contract that was written on the house . . . was a fraudulent contract." Ward also told Mr. Qualls that he was not trying to take the home and that "he just wanted to let us know that we needed to follow through and get [our] title insurance. And with the title insurance, once we filed that, we could get the home free and clear." During Ward's conversation with Mr. Qualls, Ward mentioned that Zillow, an online real estate tool, valued the home at $401,000.

Mr. Qualls testified that Ward claimed to have paperwork showing that "there was a judgment on the house" and, therefore, that the sales contract for the home was fraudulent. Ward offered to send the paperwork to Mr. Qualls via e-mail. Ward told Mr. Qualls to have the title company "do the title insurance," and Mr. Qualls was to give some of the money he received from the title insurance claim to Advocacy for Consumer Rights. Mr.

Qualls said that he and Ward talked on the front porch for about twenty minutes and that Ward was "very convincing" and appeared to know what he was talking about.

Mr. Qualls testified that when he moved into the McCanless Road home, a "zip line" was already in the back yard. While Ward and Mr. Qualls were talking, Ward mentioned the zip line. Ward's knowledge about the zip line "kind of concerned" Mr. Qualls and "raised a red flag" because Mr. Qualls did not know Ward and because the zip line could not be seen from the road. Later that day, Ward e-mailed a document to Mr. Qualls that had been recorded in the Williamson County Register of Deeds Office on March 15, 2016. The document was titled "Certified Copy of Judgment" and was twenty-seven pages in length. The document appeared to be a legal judgment that had been entered by the "Federal Postal Court." Ward's signature and thumbprint were on the top of the first page, and the judgment identified the Appellant and Richard Maltese as the plaintiffs and Wells Fargo as the defendant. The judgment stated that Wells Fargo was ordered to pay the plaintiffs over nine million dollars and "delete the loan amount on the Deed of Trust that was created on December 30th, 2011" for the purchase of the McCanless Road property. Ward's signature and thumbprint also were on the bottom of the first page, and Ward's title underneath his signature was "Clerk of the Federal Postal Court." Ward had not mentioned that he was the Clerk of the Federal Postal Court when he spoke with Mr. Qualls on Mr. Qualls's front porch.

Mr. Qualls testified that he did not understand the language in the judgment but that he was excited "a little bit" because "who wouldn't want to get a house . . . for free." A website for the Federal Postal Court and a reference number were on the judgment, so Mr. Qualls went to "Federal Postal Court dot org" on the internet and entered the reference number. The website "looked legit," and Mr. Qualls found the same documents on the website that Ward had provided to him. Mr. Qualls then "googled" the Federal Postal Court and found that the court was "a figment of a fertile imagination." He called the police, and the police came to his home and took a report. Mr. Qualls texted Ward, informing Ward that he had contacted the police. The next morning, Ward responded with a text stating that "'it's not your property anymore, you can have your attorney call me.'"

Mr. Qualls testified that he learned from a neighbor that Ward was the Appellant's brother. Mr. Qualls spoke with the Appellant on the telephone and told her to tell Ward to stop coming by the house. Mr. Qualls also told the Appellant that the Appellant was "making my wife a nervous wreck." The Appellant was calm but responded, "'[Y]ou need to control your wife.'" The Appellant told Mr. Qualls that he needed to listen to Ward because Ward "knows what he's talking about." The Appellant also told Mr. Qualls to talk to her "friend," David. A male voice came on the line, and the man "tried to explain the situation on the phone about how it was going." Mr. Qualls said that about one month later, on February 17, 2017, he received an "eviction notice" from the Federal Postal Court via certified mail. The return address on the envelope was for a post office box in Lake Havasu City, Arizona. The eviction notice stated that the McCanless Road property

- 3 -

belonged to Penny Gilly. Gilly's signature and thumbprint were on the top right corner of the document, and her signature was on the bottom of the document. Mr. Qualls had never heard of Gilly and contacted the police. The next day, Mr. Qualls was in the driveway of his home and saw Ward ride by the house. Ward was the passenger in a black Toyota Prius, but Mr. Qualls could not see the driver. Mr. Qualls and Ward made eye contact for thirty to forty-five seconds, and Mr. Qualls felt "[t]hreatened."

Mr. Qualls testified that he later received a letter from Shellnut-Campbell Insurance Agency that was addressed to Gilly. The letter was dated February 22, 2017, and included a document showing that an Auto-Owners homeowners policy had been issued on the McCanless Road property. The policy became effective on February 17, 2017, which was the same day that Mr. Qualls received the eviction notice. The one-year premium for the policy was $1,478.96 and had been paid in full. Mr. Qualls was "[s]cared" and called Auto-Owners to verify that the policy was active. He then went to the sheriff's office and spoke with Detective Lee Eaves. Subsequently, Mr. Qualls's title company contacted him and advised him that Gilly had listed the home for sale. Mr. Qualls said that he had never spoken with Gilly and that he had never given anyone permission to take out an insurance policy on his home or sell his home.

On cross-examination, Mr. Qualls acknowledged that he filed a civil lawsuit related to this case. He also acknowledged that prior to January 2017, there were no issues with his purchase of the Appellant's home and that the Appellant never mentioned anything about the Federal Postal Court. When the nine-million-dollar default judgment was entered by the Federal Postal Court, Mr. Qualls was still living in Nashville. Ward, not the Appellant, signed the judgment. Mr. Qualls acknowledged that Ward had "an elaborate plan" to make the judgment look legitimate and that Ward did not mention the Appellant. Mr. Qualls also acknowledged that when he talked with the Appellant on the telephone, she did not tell him what to do. Instead, she told him to follow Ward's "lead" because Ward knew what he was doing. The Appellant did not say anything about her involvement in Ward's business, and Mr. Qualls did not have any further conversations with her.

Mr. Qualls testified that on March 15, 2017, he obtained a temporary order of protection against Ward. Mr. Qualls did not seek an order of protection against the Appellant. Mr. Qualls said he thought Ward "believed with his whole heart" that the contract on the McCanless Road property was fraudulent. Mr. Qualls's family was never displaced from the home, and the family was still living there at the time of the Appellant's trial in July 2019.

Detective Lee Eaves of the Williamson County Sheriff's Office testified that he had experience with mortgage fraud and that he was the lead investigator in the case. Detective Eaves met with Mr. Qualls, and Mr. Qualls told Detective Eaves about his interactions with Ward. Detective Eaves obtained documents from the Williamson County Register of Deeds and found a default judgment that had been recorded on March 15, 2016. The

judgment named the claimants as the Appellant and Richard Maltese and the defendant as Wells Fargo. The property identified in the judgment was the residence on McCanless Road. Ward's signature and thumbprint were on the judgment, and the judgment bore the seal of the Federal Postal Court.

Detective Eaves testified that he researched the Advocacy for Consumer Rights and the Federal Postal Court. He stated,

> I learned that the Federal Postal Court -- the judge of the Federal Postal Court was David Wynn Miller. He claimed that Benjamin Franklin started Federal Postal Court on July 4th of 1775. And then it was closed shortly thereafter in 1776. Judge Miller claims that he reopened that Court in 2012 and so he claims to be the Judge. Mr. Ward claims to be the Clerk. And this Postal Court operates on the basis that there is a sophisticated, mathematical understanding of languages that proves that certain documents are fraudulent and not enforceable.

Detective Eaves said he also learned that the Federal Postal Court was "an off-shoot of some sovereign citizen beliefs." He explained, "So sovereign citizens are self described as that their sovereign from the United States. And they believe in . . . their interpretation of common law and don't recognize the United [States] Government or Government statutes as the community understands them." Detective Eaves stated that although the Federal Postal Court had an active website at that time, the court was a "sham" and did not exist. Detective Eaves acknowledged that the default judgment entered against Wells Fargo appeared to discharge the debt the Appellant and Richard Maltese owed to Wells Fargo for their purchase of the McCanless Road home and that the judgment ordered Wells Fargo to pay the Malteses more than nine million dollars. Detective Eaves said that although judges normally signed judgments, Ward signed the judgment against Wells Fargo; Judge Miller did not sign the document.

The State showed a document titled "Quiet Title Command" to Detective Eaves, and he stated that the document appeared to have been entered by the Federal Postal Court. The document was recorded in the Williamson County Register of Deeds Office on January 10, 2017, the day before Ward visited Mr. Qualls, and the Register of Deeds filing receipt identified Ward as the "pick-up" person for the document. Detective Eaves acknowledged that the document was written in "syntax grammar." He explained that a quiet title action was "a tool used to remove a person's interest from a property or in short to quiet someone else's interest in a property." The Appellant and Richard Maltese were named as the claimants in the document, Wells Fargo was named as the defendant, and the property at issue was the residence on McCanless Road. Ward's signature and thumbprint were on the bottom of the document, and the document bore the seal of the Federal Postal Court.

The State then showed a document titled "[W]arranty [D]eed" to Detective Eaves. He acknowledged that the document was written in the same syntax grammar as the previous document and that it was recorded in the Williamson County Register of Deeds Office on February 15, 2017. The Register of Deeds filing receipt identified the Appellant as the pick-up person for the document. Detective Eaves said the warranty deed purported to transfer ownership of the McCanless Road property from the Appellant and Richard Maltese to Gilly. The signatures of the Appellant, Richard Maltese, and Gilly appeared on the document, and a thumbprint was beside each signature. The document also was notarized. Based on the documents and the information Detective Eaves received from Mr. Qualls, Detective Eaves believed criminal offenses had been committed and submitted the case to the district attorney's office for the presentment of charges.

On cross-examination, Detective Eaves testified that he first met with Mr. Qualls on March 8, 2017, and took a report. According to his report, Ward told Mr. Qualls that Ward was the Appellant's brother. During the detective's research in the case, he never found anything that linked the Appellant to the Federal Postal Court or Advocacy for Consumer Rights. The address for Advocacy for Consumer Rights was a post office box in Lake Havasu City, Arizona. The Appellant and Richard Maltese did not sign the default judgment against Wells Fargo, and Ward appeared to have recorded the default judgment in the Register of Deeds Office. Detective Eaves did not question the person who notarized the warranty deed that purportedly transferred the McCanless Road property from the Malteses to Gilly. The signatures of the Appellant, Richard Maltese, and Gilly appeared on that document. However, all three of the signatures were written in block letters, not cursive.

Detective Eaves acknowledged that Ward believed what he told Mr. Qualls was true and that Ward appeared to be "in charge of all this." Moreover, "Mr. Ward [was] the one . . . whose name with the Federal Postal Court [was] on these documents." Detective Eaves did not attempt to interview the Appellant before she was charged with a crime. He tried to interview her after her arrest, but she declined.

Richard Maltese, the Appellant's ex-husband, testified that he was charged with an offense in this case and that the State had not promised him anything in exchange for his testimony. At the time of the Appellant's trial, the Appellant lived in Michigan, and Mr. Maltese lived in Lake Havasu City, Arizona. The Appellant and Mr. Maltese shared two children, and Mr. Maltese described his relationship with his ex-wife as "[g]ood."

Mr. Maltese testified that he and the Appellant used to own and live in the home on McCanless Road. Gilly lived with them. In 2015, the Appellant and Ward, who lived in Arizona, began discussing "business stuff and ideas" on the telephone. Mr. Maltese said that their conversations "had to do with mortgage[s] and lenders" and that Ward "was talking to different people trying to possibly get help with what he was doing." The Appellant began working for Ward by answering telephone calls she received for him at

- 6 -

the McCanless Road home. She would answer the telephone by saying, "Advocacy for Consumer Rights" and would "read a script" that Ward had written. People would call because they had received "a letter with a number on it," and the Appellant would talk with them about their mortgages. Ward used "a mailing list" to send the letters.

Mr. Maltese testified that the Appellant sounded friendly on the telephone. She would ask for the reference number on the caller's letter and would access the caller's information on a computer. The Appellant would tell the caller that the caller had received the letter because Ward had noticed "there was a red flag or something was wrong" with the caller's mortgage. The Appellant would be busy some days taking calls, but other days would be "really, really slow, one or two calls." Mr. Maltese and the Appellant talked about her work "[o]ff and on," but Mr. Maltese was never involved in the telephone calls.

Mr. Maltese acknowledged that Ward's business seemed legitimate. Mr. Maltese did not have much of a relationship with Ward, but Mr. Maltese would see Ward in Lake Havasu City when Mr. Maltese visited Mr. Maltese's parents, who also lived there. Ward told Mr. Maltese that "the banks and the government and some of these mortgage things are incorrect." Mr. Maltese said Ward "felt like he was in the right and he was on to something." Ward visited David Wynn Miller, who lived in Hawaii, and Miller and Ward went camping together in Arizona. The Appellant knew of Miller and told Mr. Maltese that Miller was "a real smart guy."

Mr. Maltese testified that Ward charged clients $3,500 for his services. Ward paid the Appellant one hundred dollars "if he closed the deal that she had gotten." The State asked if Ward was ever successful "in helping these clients get out from underneath their mortgages," and Mr. Maltese answered, "No. I heard that he was close a couple of times and that a couple of them were going to go through." Mr. Maltese said that he did not know how much money Ward and the Appellant made from the business but that Ward was "doing pretty well." The Appellant "wasn't [making] a substantial amount" of money from Ward and told him that she wanted more money. Ward told the Appellant, "[T]hen you get more leads." Mr. Maltese had a full-time job and "wanted nothing to do with" Ward's business.

Mr. Maltese testified that in 2015, his family moved from the McCanless Road home to Murfreesboro. At the end of 2016, the Appellant visited Ward in Arizona. In January 2017, Ward visited the Appellant in Murfreesboro. One day while Ward was visiting, Gilly told Mr. Maltese that she had to visit a notary. Mr. Maltese said "they" also told him that "there was a title [judgment] against the [McCanless Road] house." Gilly and the Appellant claimed that "the house shouldn't have been sold because [there] was a lien against the property." Mr. Maltese never talked with Ward about the house.

Mr. Maltese testified that he "might have been told" about the default judgment that was recorded in the Register of Deeds Office on March 15, 2016, but that he did not have

anything to do with recording the document. Mr. Maltese explained, "I was told at one point that there was something wrong with the McCanless house and that [Ward] was going to help us for free and not charge us because we're family." Mr. Maltese said that he did not know what a quiet title action was and that he signed the warranty deed transferring the house to Gilly because the Appellant told him to do so. Mr. Maltese's thumbprint was on the warranty deed, and the deed was notarized. The Appellant told Mr. Maltese that Ward was going to help them with a mortgage "problem," and Gilly told Mr. Maltese that Ward "would never do anything to hurt" the family. Gilly was "a sweet woman," so Mr. Maltese believed her. Nevertheless, he felt "a little uneasy" about signing the warranty deed. Gilly and the Appellant trusted Ward, and Mr. Maltese "had no reason to believe there was anything illegal, wrong with what they were doing."

Mr. Maltese testified that when he learned about a warrant for his arrest, he was "freaking out" and telephoned the Appellant. The Appellant was "still in defense" of Ward and told Mr. Maltese that "this is BS." The Appellant also was "very upset about what they were doing to her mom." The State asked if Mr. Maltese regretted "signing these things and thumbprinting and filing documents without knowing what they were," and the Mr. Maltese answered, "Every day for the last three years, yes."

On cross-examination, Mr. Maltese testified that he and the Appellant met in Arizona and that they were married for eleven years. The Appellant and Ward had a "very close" relationship, the Appellant respected him, and the Appellant thought Ward's business was legitimate. After Mr. Maltese was arrested, he hired an attorney. His attorney advised him to prepare a timeline of events and testify truthfully at the Appellant's trial. Mr. Maltese acknowledged that Ward "orchestrat[ed] all this" and that Ward "got [the Appellant and Gilly] excited about it." Mr. Maltese reiterated that he did not know how much money the Appellant made from Ward. However, he heard her say, "I made $600.00 this week or $500.00 this week." At the conclusion of Mr. Maltese's testimony, the State rested its case.

The Appellant testified that she was forty-eight years old, that Ward was her brother, and that Gilly was their mother. The Appellant was three years older than Ward, and they had a "very close" relationship. She described Ward as "a very hard worker," "a nice guy," and "really, really funny." In 2002 or 2003, the Appellant met Richard Maltese in Lake Havasu City, Arizona. They dated, got married, and moved to Tennessee in 2010. On January 1, 2012, they moved into the home on McCanless Road.

The Appellant testified that while they were living in the home, Ward began learning about mortgages and refinancing. Ward told the Appellant, "I met this guy and these mortgages are all fraudulent because you can't even understand them." The Appellant said Ward was "really excited" about people refinancing their homes because "everyone got . . . screwed . . . on their mortgages" in 2008. She also said Ward was "very methodical, and he thought it through and he was very efficient."

The Appellant testified that in 2012 or 2013, she was "happily" working at a dog grooming business. Ward needed someone he could trust to "answer the phones, read a script," so Gilly suggested that Ward hire the Appellant. Ward explained to the Appellant that "the banks take advantage of people" and that "the government wants you to report people that do bad things." The Appellant believed Ward, so she started answering his telephone for him. If Ward mailed flyers to people, the Appellant would be "super busy" answering calls. However, if he did not mail flyers, the Appellant would be "napping." Gilly lived with the Appellant and her husband and helped take care of their children. The Appellant said that she did not know how much money she made from Ward because she and her husband gave all of their money to Gilly, who then paid their bills. The Appellant said she did not care how much money she earned from Ward's business because she "wasn't doing it for the money." She said she was joking when she told Ward that she wanted him to pay her more money.

The Appellant testified that in August 2015, she and her husband moved their family to Murfreesboro. The McCanless Road home was vacant. In January 2016, the Appellant and Mr. Qualls signed a purchase agreement for the home. However, Mr. Qualls had trouble selling his home in Nashville, so the Qualls family moved into the McCanless Road home and began paying rent. In February 2016, the Appellant learned that a default judgment had been entered in her favor and thought that she had "just become a multi-millionaire." Ward was "so happy" about the judgment, and the Appellant thought she was "rich." The Appellant sent a copy of the judgment to her realtor, who was handling the sale of the McCanless Road home to Mr. Qualls, and told her realtor that a lien was on the property. The Appellant and Mr. Qualls finalized the sale of the home in June 2016.

The Appellant testified that she and her husband separated, that she rekindled a relationship with an old boyfriend, and that she went to Michigan to be with him. On January 12, 2017, while the Appellant was in Michigan, Mr. Qualls telephoned her. The Appellant saw his number on her telephone but did not answer his call. She "got this weird feeling" and telephoned Ward. Ward told her that he had gone to the McCanless Road home. The Appellant was angry with Ward and returned Mr. Qualls's call. Mr. Qualls told her that "your brother came by my house today." He also told her that Ward claimed a lien was on the property and that Ward claimed the property did not belong to Mr. Qualls. The Appellant told Mr. Qualls that Ward was "a little bit eccentric" but that "his heart is good" and that he wanted to help people. She then put her boyfriend, Jonathan, on the telephone. Jonathan talked with Mr. Qualls for fifteen to twenty minutes, "just explaining in detail as best as he could understand [Ward]."

The Appellant testified that during her conversation with Mr. Qualls, he said that his wife had a medical condition and was nervous all the time. The Appellant told Mr. Qualls that she was sorry and that "we don't mean any harm." She denied telling Mr. Qualls that he needed to control his wife. The Appellant promised Mr. Qualls that she was

not going to take his house and told Mr. Qualls to talk with Ward so Ward "can explain it." She never told Mr. Qualls to listen to Ward or do what Ward said. The Appellant was not even in Tennessee when Ward went to Mr. Qualls's house.

The Appellant testified that she did not draft any documents for Ward. The Appellant signed, in cursive, the 2016 warranty deed that transferred the McCanless Road property to Mr. Qualls. Subsequently, Ward told the Appellant that the title company had ignored the lien on the property; therefore, the Appellant still owned the home. The Appellant told Ward that she did not want the property, but Ward was "adamant about going after this." The Appellant acknowledged that she then "signed" the warranty deed that purportedly transferred the McCanless Road home to Gilly. The Appellant signed the deed using block letters because Ward told her "that's how we had to do it." He explained to her that "a cursive signature, curse-ive, is a dead signature. It's a curse, it's cursive, if you studied words." Ward also told her that her fingerprint was her seal and the only way to prove she actually signed the document. Ward's explanation "made sense" to the Appellant. The Appellant and Gilly then took the deed to the Register of Deed's Office and had it recorded.

The Appellant testified that she heard Ward and Gilly talking about an insurance policy. Ward said they needed the policy for the McCanless Road property in case Mr. Qualls damaged the home. The Appellant stated, "It made sense to me because if everything was true, what's a little insurance policy going to do. . . . So I didn't see where that hurt anybody." The Appellant did not think Mr. Qualls would find out about the policy. Ward knew the Appellant would never sign an eviction notice, and the Appellant did not know about the eviction notice "until well after the fact." When she found out about it, she was "pissed." The Appellant said that she "[a]bsolutely" believed everything Ward told her and that she never meant to hurt anyone or take anyone's property. The Appellant said she signed the second warranty deed because Ward told her that "it's just proving that you still own the property"; she did not know the deed purportedly transferred the McCanless Road property to Gilly. The Appellant said she thought Ward still believed his business was legitimate.

On cross-examination, the Appellant acknowledged that Ward was in "pretty serious trouble" in Arizona and said that he was serving a twenty-three-year prison sentence there. He was convicted by an all-female jury, and the Appellant did not think he received a fair trial. She said that she had not spoken with Ward in eight months to a year and acknowledged that she was "upset" with him. She stated that she did not ask Ward to go to the McCanless Road home, that she did not give him permission to do so, and that he "[got] me into this situation."

The State asked if the Appellant still thought the Federal Postal Court was a legitimate court, and the Appellant testified, "I don't know. . . . I can't say yes. I can't say no. I bet you the pioneers crossing the Oregon Trail didn't think airplanes were real or

didn't believe that someday you could talk from one end of the earth to the other, but it was going to happen." The Appellant said that she met Miller twice and that Ward and Miller believed in syntax grammar. Ward explained to the Appellant that the language in contracts "needed to be mathematical, one plus one equals two, so that anybody could read it, anybody could understand it . . . . He wanted it to be fair for everyone." Ward told his clients that he could show them for free how to get out of their fraudulent mortgages or that he could do it for them for a fee. Eventually, though, he stopped charging a fee and began helping clients on a "contingency" basis. However, none of Ward's clients were able to "escape" their mortgages.

The Appellant testified that she recorded only one document in the Register of Deeds Office and that Ward "did everything else." When Ward recorded the default judgment with the Register of Deeds on March 15, 2016, the McCanless Road house was for sale. The Appellant said that she knew about the judgment but that she did not know the judgment had been recorded. She sent a text to her realtor, advising him that the McCanless Road property was going to have a lien on it soon and that "you need to deal with that, tell the title company." She said the title company knew about the lien but "ignored" it.

The Appellant testified that Ward also had a default judgment related to Gilly's home recorded in another state. That judgment awarded Gilly eleven million dollars. The Appellant thought the default judgments meant that she was going to receive nine million dollars and that Gilly was going to receive eleven million dollars. The Appellant did not know that Ward had recorded the Quiet Title Command with the Register of Deeds and was "shocked" when she found out about it. She also did not know that Ward had sent Mr. Qualls an eviction notice. Ward had "never pressured people" previously, so the Appellant never considered that Ward pressured Mr. Qualls. The Appellant said she did not know that recording the warranty deed on February 15, 2017, could harm the Qualls family because she did not understand what recording the document meant. Moreover, Ward promised her that they were not harming anyone. The Appellant heard Ward and Gilly talking about listing the McCanless Road home for sale and thought it was a "ridiculous" idea. However, she did not know they actually listed the home. The Appellant reiterated that she never meant to hurt anyone, that Ward believed in what he was doing, and that she and Gilly trusted him. She said Ward used her as a "guinea pig" to "test this out" but refused to say he was a "con man."

At the conclusion of the proof, the jury convicted the Appellant of conspiracy to commit theft of property valued $250,000 or more in count two and criminal simulation in count four but found her not guilty of hindering secured creditors in count five. After a sentencing hearing, the trial court sentenced her to concurrent sentences of eight years for conspiracy to commit theft of property valued $250,000 or more, a Class B felony, and one year for criminal simulation, a Class E felony. The trial court ordered that the Appellant

serve the effective eight-year sentence as forty-eight hours in jail followed by supervised probation.

## II. Analysis

On appeal, the Appellant contends that the evidence is insufficient to support the convictions and that the trial court erred by allowing the State to cross-examine her about the lengthy prison sentence Ward was serving for similar conduct. The Appellant acknowledges that her notice of appeal was untimely filed and asks that we waive the timely filing. Rule 4(a) of the Tennessee Rules of Appellate Procedure instructs that "the notice of appeal required by Rule 3 shall be filed with the clerk of the appellate court within 30 days after the date of entry of the judgment appealed from[.]" The trial court denied the Appellant's motion for new trial on February 24, 2020. The Appellant filed her notice of appeal thirty-two days later on March 27, 2020, rendering it untimely. Regardless, Rule 4 provides that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the timely filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). We have chosen to waive the timely filing to address the Appellant's concerns.

### A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support her convictions. The State argues that the Appellant has waived her sufficiency claim and that, in any event, the evidence is sufficient. We agree that the evidence is sufficient to support the convictions.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140

(Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. Tennessee Code Annotated section 39-12-103(a) provides that the

offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Additionally, "[n]o person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." Tenn. Code Ann. § 39-12-103(d). "A conspiracy requires knowing involvement." State v. Shropshire, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). The conspiracy need not be manifested by formal words or an express agreement. Id.; State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); State v. Cook, 749 S.W.2d 42, 44 (Tenn. Crim. App. 1987). The existence of the conspiracy may be established by circumstantial evidence and by the conduct of the parties in executing the object of their agreement. Shropshire, 874 S.W.2d at 641; Cook, 749 S.W.2d at 44.

As charged in this case, "[a] person commits the offense of criminal simulation who, with intent to defraud or harm another . . . [a]uthenticates or certifies an object so made or altered as genuine or as different from what it is." Tenn. Code Ann. § 39-14-115(a)(1)(C). The indictment alleged that the Appellant and Gilly "did authenticate or certify an object, to wit: a document filed with the Williamson County, Tennessee, Register of Deeds, purporting to transfer the property located [on] McCanless Road from Noel and Richard Maltese to Penny Gilly."

Initially, we note that the State contends that the Appellant has waived this issue because she failed to provide any citations to the record and because her entire argument consists of the following statements: "Here the evidence was insufficient to demonstrate that Ms. Maltese had the requisite criminal intent. The evidence was that she believed what

- 13 -

Mr. Ward told her and was taking action at his instruction." As pointed out by the State, Tennessee Rule of Appellate Procedure 27(a)(7) provides that an appellate brief must contain an argument "setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on." See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We agree with the State that the Appellant's brief is inadequate. Nevertheless, we will briefly address the sufficiency of the evidence.

Taken in the light most favorable to the State, the proof shows that the Appellant and Richard Maltese transferred ownership of their home on McCanless Road to Mr. and Mrs. Qualls via warranty deed in June 2016. However, on January 10, 2017, Ward recorded a document purporting to bring a quiet title action against Wells Fargo Bank on behalf of the Appellant and Mr. Maltese for the property. Approximately one month later, on February 15, 2017, the Appellant and Mr. Maltese "signed" a second warranty deed purporting to transfer the property to Gilly, and the Appellant had the document recorded in the Register of Deeds Office. Subsequently, Ward sent an eviction notice to Mr. Qualls, and Gilly obtained an insurance policy on Mr. Qualls's home and listed the home for sale.

Although the Appellant testified that she never meant to harm anyone and never intended to take the McCanless Road property from Mr. Qualls, the Appellant was well-aware of Ward's and Gilly's actions. Moreover, soon after Ward visited Mr. Qualls, Mr. Qualls alerted the Appellant to Ward's scheme. The Appellant not only told Mr. Qualls that he needed to listen to Ward because Ward knew what he was doing, she continued to go along with Ward's plan by "signing" the second warranty deed transferring the McCanless Road property, which lawfully belonged to Mr. and Mrs. Qualls, to Gilly. That same day, the Appellant personally delivered the fake warranty deed to the Williamson County Register of Deeds Office to be recorded. Therefore, we conclude that the evidence is sufficient to support the Appellant's convictions of conspiracy to commit theft of property valued $250,000 or more and criminal simulation.

## B. Cross-Examination

Next, the Appellant contends that the trial court erred by allowing the State to cross-examine her about the fact that Ward was serving a lengthy prison sentence for the same or similar conduct as the Appellant. The Appellant contends that the evidence was not relevant and, in the alternative, that its probative value was substantially outweighed by the danger of unfair prejudice. The State argues that the Appellant opened the door to questioning about Ward's criminal history. We agree with the State.

Before the State began cross-examining the Appellant, the State requested that the parties approach the bench. The State advised the trial court that the Appellant had "basically paint[ed] her brother as a knight in shining armor that he held himself out a someone that was helping people" and, therefore, that the Appellant had "opened the door" to the State "asking her something along the lines of 'you know now that that's not true, right[?]'" The State asserted that if the Appellant answered "yes," then the State should be allowed to elicit from her that Ward was in prison. The trial court noted that the Appellant testified on direct examination that Ward thought he was helping people and ruled that the State could ask her, "Isn't he in serious trouble for what he's done[?]"

When the State began cross-examining the Appellant, the following exchange occurred:

> Q. Ma'am, do you to this day, you believe what your brother was doing to people was right, don't you?
>
> A. What I say -- you're trying to put words in my mouth -- I believe he believed in what he was doing was right. Do I believe it was right?
>
> Q. Yes.
>
> A. I don't know. I don't -- do I think banks are corrupt?
>
> Q. Do you think he was trying to help people?
>
> A. Absolutely.
>
> Q. And do you think what he was doing in order to try to help those people was legitimate?
>
> A. The way he explained it, yes.
>
> Q. So that's a yes?
>
> A. Yes.
>
> Q. Well, he's in pretty serious trouble in the State of Arizona right now, isn't he?
>
> A. Yes.
>
> Q. Expound on that for us.

A. How so?  You want me to say something?

Q. Where is he?

A. He's in prison.

Q. For how long?

A. I don't know, 23 years, all female jury.

Q. Twenty-three -- all female jury?

A. Uh-huh.

Q. Why is that important?

A. Just I don't think he got a fair case.

The propriety, scope, manner, and control of the cross-examination of witnesses rests within the discretion of the trial court.  State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995).  Tennessee Rule of Evidence 611(b) states, in part, that "[a] witness may be cross-examined on any matter relevant to any issue in the case."  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Tenn. R. Evid. 403.

"'[O]pening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence."  State v. Vance, 596 S.W.3d 229, 250 (Tenn. 2020).  The doctrine of opening the door is intended to serve fairness and truth-seeking.  Id.  Accordingly, the remedy sought after a party has opened the door should be "relevant and proportional" and "limited to that necessary to correct a misleading advantage created by the evidence that opened the door."  Id. at 251.

The Appellant notes that the crimes occurred in 2017 and that her trial occurred two years later in 2019.  She contends that the State's line of questioning regarding her belief about Ward's intentions at the time of her trial was irrelevant to her mental state at the time of the crimes.  However, the trial court allowed the questioning because the Appellant "had paint[ed] her brother as a knight in shining armor."  We agree with the trial court that the Appellant opened the door to the fact that Ward was in "serious trouble" for his actions.  Throughout defense counsel's cross-examination of the witnesses, counsel repeatedly

- 16 -

elicited that Ward thought his business was legitimate and thought he was helping people. On direct examination of the Appellant, the Appellant described Ward as "a nice guy" and said that he believed what he was doing was right because people "got screwed on their mortgages." The Appellant also suggested that Ward was acting pursuant to a government whistle-blower program, stating as follows:

> He goes, I can do this on your house, I'm not going to charge you. I'm going to file a claim and send it to the government because there's this Whistle-Blower Program where if you report a crime, then we will reward you money. And so I'm like, okay, well, why would they do that? Government wants to know that there are bad people out there.

Even after the Appellant stated on cross-examination that Ward was serving a twenty-three-year prison sentence in Arizona, she maintained that he wanted contracts to be "fair" for everyone and that he wanted to help people "get out of their fraudulent mortgages." She refused to acknowledged that the Federal Postal Court was not a legitimate court or that Ward was a con-man. Thus, we conclude that the trial court did not err.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE